## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| MICHAEL SCHMALTZ, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     Case No. 4:17-CV-0285-RLW |
| | ) |
| NANCY BERRYHILL, | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the final

decision of Nancy Berryhill, the Acting Commissioner of Social Security ("the Commissioner"),

denying Michael Schmaltz's application for disability insurance benefits ("DIB") under Title II

of the Social Security Act ("the Act"), 42 U.S.C. § 401-433, and for supplemental security

income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1381-1383b.

### Procedural History

Michael Schmaltz ("Plaintiff") applied for DIB and SSI in June 2012, alleging that he

became disabled in February 2010 because of neuropathy, gout. arthritis, allergies, back pain,

and limited use of his hands. (Tr. at 228-40, 279.) After the denial of his applications on initial

review, Plaintiff requested a hearing. (*Id.* at 93-105, 117-23.) The initial denials were affirmed

after he failed to appear at the hearing. (*Id.* at 106-10.)

Following a remand by the Appeals Council, another hearing was scheduled for October

2013. (*Id.* at 39-45.) The case was continued at Plaintiff's counsel request. (*Id.*) After a

hearing held in September 2015, Plaintiff's applications were again denied. (*Id.* at 13-31, 47-

92.) The Appeals Council denied review, thereby adopting the decision of the Administrative Law Judge ("ALJ") as the final decision of the Commissioner.

## Testimony Before the ALJ

Plaintiff, represented by counsel, and James Israel, a vocational expert ("VE"), testified at the hearing.

Plaintiff was then fifty-one years old, right-handed, and homeless. (*Id.* at 50-51.) He had been evicted from a nursing home after he turned them into the police for beating patients. (*Id.* at 51.) He explained he had difficulty finding a new place because of the six restraining orders his son's mother had against him. (*Id.* at 52.) He was waiting until after the hearing to make a housing decision. (*Id.*) Plaintiff did not graduate from high school, but did get his General Equivalency Degree ("GED") ten years later. (*Id.* at 73.) He went to five years of college on the GI bill, but never graduated. (*Id.* at 59.) He later testified he went to college on running and music scholarships. (*Id.* at 72-73.)

Plaintiff was in the National Guard for eleven years. (*Id.* at 55.)

Plaintiff is taking Ventolin for bronchitis, omeprazole for gastroesophageal reflux disease ("GERD"), lisinopril for high blood pressure, aspirin for his heart, Donepezil for dementia, Flexeril for spasms, ibuprofen, and oxycodone. (*Id.* at 56-57.) He uses an inhaler for his asthma and has trigger point injections and epidurals. (*Id.*) He is taking a break from the oxycodone, and does so "every so often." (*Id.* at 57.) The only medication that stops his pain is oxycodone. (*Id.* at 59.) He does not have any side effects from his current medications. (*Id.* at 58.)

Plaintiff has been on Medicaid for four or five years. (*Id.* at 61.)

Plaintiff uses a motorized scooter; he received it from Paraquad and has had it "for years." (*Id.* at 62, 68.) He also uses a cane. (*Id.* at 77.) Paraquad has been helping him find another place to live. (*Id.* at 63.)

Asked if he took any drugs other than those prescribed, Plaintiff replied that he did not. (*Id.* at 66.) Also, he seldom drank. (*Id.*) A few years ago, he would drink "a couple of beers," but he no longer drinks at all. (*Id.* at 66-67.) He does not belong to any support group because there is no reason to; he does not have a problem with drugs or alcohol. (*Id.* at 67.)

The majority of Plaintiff's past work was in restaurants. (*Id.* at 70.) He has tried to do some construction work. (*Id.*) He no longer works in restaurants because he drops things and gets angry. (*Id.* at 79.) He had hoped to re-enlist, but would injure himself every time he came close to doing so. (*Id.* at 70.) He first enlisted in February 1985. (*Id.* at 71.) He was in a chemical unit for one year beginning in October 2007. (*Id.* at 72.) He is trying to qualify for Veteran's Administration ("VA") treatment. (*Id.*)

Plaintiff testified that he often drops things and can walk no longer than five minutes. (*Id.* at 78.) He has had problems with his right hand since 1983. (*Id.*) He can no longer work because he gets angry. (*Id.* at 79, 80.) Several times a day his pain is so bad he lies down and doesn't do anything. (*Id.* at 75.) The frequency depends on how many pain medications he is willing to take. (*Id.*)

Plaintiff spends his days at a Bread Company restaurant. (*Id.* at 78.) He helps out by watching the customers for drug use and stealing. (*Id.*)

The VE was asked to assume a hypothetical individual of Plaintiff's age, education, and work experience; who can occasionally lift twenty pounds and frequently lift ten pounds; who can stand or walk about six hours in an eight-hour day and can sit for as long; and who should

3

avoid (a) climbing ladders, ropes, and scaffolds, (b) working around unprotected, dangerous heights and machinery, (c) jobs that expose him to whole body vibration, (d) ambulating on unimproved terrain, and (e) concentrated exposure to noxious fumes, odors, dusts, gases, and extreme cold. (*Id.* at 84-85.) This person is "limited to simple and/or repetitive work that [doesn't] require close interaction with the public or teamwork type interaction with co-workers." (*Id.* at 85.) Asked if such a person can perform Plaintiff's past relevant work, the VE explained that he cannot. (*Id.*) He can, however, perform work as a packer, assembler, or product inspector. (*Id.* at 85-86.) If the most he can lift is ten pounds and the longest he can stand or walk is two hours, the types of product inspector and assembler are limited, but not precluded. (*Id.* at 86.) This hypothetical person can also work as a production worker. (*Id.*)

If the person will consistently miss more than two days a month or will be late or have to leave work early at least once a week, the person will be unacceptably unreliable. (*Id.* at 87.) If the person has only occasional use of his hands, there are no jobs he can perform. (*Id.* at 88.) If the person will engage in an explosive display of insubordination, there are no jobs for him. (*Id.* at 88-89.)

## Medical Records and Other Before the ALJ

On a Disability Report, Plaintiff disclosed that he was then 4 feet[1] 8 inches tall and weighed 182 pounds. (*Id.* at 279.) He worked construction off and on from 1993 to 2012 and worked in restaurants from 1992 to 2010. (*Id.* at 280, 285.) On a Function Report, he disclosed he does "handy-man work" for three to six hours three days a week. (*Id.* at 297.) He avoids heavy lifting or working with vibrating tools. (*Id.*) He has a hard time holding utensils. (*Id.* at 298.) He tends not to take certain medications because he needs to work or because they place

---

[1]Medical records describe him as 5 feet, 8 inches tall.

4

stress on his heart. (*Id.* at 299.) Twice a month, he cooks, cleans, and, when possible, does yard work. (*Id.*) When he cooks, he prepares meals for a few days. (*Id.*) He goes outside every day and, when he does, he walks, rides in a car, uses public transportation, or rides a bicycle. (*Id.* at 300.) He does not drive. (*Id.*) He sold his bike to get money and stopped working out or running because of his impairments. (*Id.* at 301.) He does not follow spoken instructions well, but follows written ones "perfectly." (*Id.* at 302.) He wears glasses every day and uses a cane to get up from the couch. (*Id.* at 303.) He does not get along well with authority figures. (*Id.*)

Plaintiff's relevant medical records begin in September 2009 with those of an emergency room visit to Barnes Jewish Hospital ("BJH"). (*Id.* at 449-76.) He was then in police custody and reported having chest pain that began when he was arrested. (*Id.* at 449.) He explained that he had been told the week before when seen by another provider that he had had a mild heart attack. (*Id.*) He had been intoxicated until 4 a.m. and requested Vicodin (a combination of acetaminophen and hydrocodone). (*Id.*) On exam, he was alert and oriented to time, place, and person. (*Id.*) His affect was normal; his mood and behavior was appropriate. (*Id.* at 454.) His chest x-rays were unremarkable. (*Id.* at 459, 470.) He was diagnosed as having an anxiety attack and was discharged. (*Id.* at 463.)

Plaintiff was again seen at the BJH emergency room in October. (*Id.* at 477-505.) Again, he was in police custody. (*Id.* at 477.) He had injured his right forearm in a fist fight with another inmate. (*Id.* at 483.) The forearm was x-rayed and placed in a splint; Plaintiff was discharged the next day. (*Id.* at 497, 501-05.) One week later, Plaintiff's forearm was operated on, including the placement of a plate. (*Id.* at 506-08.) At a subsequent check-up he was reported to be "doing very well." (*Id.* at 509-15.) He was to lift no more than five pounds for the next six weeks and return in four weeks. (*Id.* at 510.)

5

Plaintiff's next medical record is from June 4, 2012, [2] when he was seen by Emilio Bianchi, P.A., as a new patient at St. Louis Connect Care ("SLCC") for complaints of a swollen hand and wheezing. (*Id.* at 837-42.) He was working as a tuck-pointer. (*Id.* at 837.) After a chest x-ray was taken and showed hyperinflation, he was diagnosed with an upper respiratory infection and encouraged to stop smoking. (*Id.* at 655, 839, 842.)

Two days later, Plaintiff was seen at Grace Hill Center ("Grace Hill") for complaints of back pain, allergies, gout, arthritis, and rectal bleeding. (*Id.* at 410-12.) He was described as being "preoccupied with disability." (*Id.* at 410.) He was diagnosed with gout, backache, and rheumatoid arthritis and prescribed various mediations. (*Id.* at 411.) Plaintiff returned the following month to review the results of his blood tests. (*Id.* at 413-23, 517-20.) He was diagnosed with myopathy, and asthma; his gout and rheumatoid arthritis were described as "resolved." (*Id.* at 414.)

In September, Plaintiff returned to Grace Hill for complaints of arthritis, seizures, body aches, and chest and back pain. (*Id.* at 523-28.) He reported a history "of multiple traumas many of which occurred when he was drunk." (*Id.* at 523.) He had abused steroids when he was a body builder and now had decreased strength and endurance. (*Id.*) Spinal x-rays showed degenerative changes but no fracture or subluxation. (*Id.* at 527-28, 843-44.) He was diagnosed with osteoarthritis. (*Id*)

Six days later, on September 30, Plaintiff was treated at the BJH emergency room after injuring his right thumb sustained when he using a grinder. (*Id.* at 584-601.) The wound was treated and Plaintiff was discharged with a prescription for oxycodone. (*Id.* at 593.)

_____

[2]This was ten days before he applied for DIB and SSI.

6

Plaintiff returned by ambulance on October 11 after burning his left foot when hot grease fell on it. (*Id.* at 570-83.) He reported he had had one beer and was working on his second; he smelled of alcohol. (*Id.* at 573.) He was diagnosed with a second degree burn, given a topical treatment, and discharged with prescriptions for tramadol and oxycodone. (*Id.* at 580.)

Plaintiff was seen at a BJH clinic on November 30 for evaluation of his musculoskeletal complaints. (*Id.* at 557-62.) He worked as a manual laborer and was concerned he would lose his job. (*Id.* at 561.) He reported being in constant pain and having difficulties walking, falling, and getting dressed. (*Id.* at 563.) A drug screen was negative. (*Id.* at 566.) Diagnostic tests were to be scheduled to investigate the cause for his pain. (*Id.* at 562.) A magnetic resonance imaging ("MRI") of his cervical and lumbar spine showed mild to moderate multilevel degenerative disease of the cervical and lumbar spine; bilateral pedicle edema at L4 and L5 with surrounding bilateral facet enhancement; and a left synovial cyst at L4-L5. (*Id.* at 603-08.)

On January 9, 2013, Plaintiff was seen at the BJH Internal Medicine Clinic for pain control. (*Id.* at 533.) He explained that he needed a new primary care physician because the previous one did not listen to him about his pain and that he needed his medications. (*Id.* at 539.) He was referred to a pain clinic. (*Id.* at 537.)

Plaintiff was taken on May 3[3] to the BJH emergency room by ambulance with complaints of pain after running out of oxycodone and OxyContin[4] and being unable to get ahold of his physician. (*Id.* at 1429-46.) He was given a prescription for oxycodone, and discharged home in

---

[3]On the patient information sheet for this visit and for twenty subsequent BJH emergency room visits, Schmaltz Contracting is listed as Plaintiff's employer. (*Id.* at 1042-60.)

[4]OxyContin is the brand name of oxycodone. *See* OxyContin, https://www.drugs.com/oxycontin.html (last visited March 15, 2018).

7

stable condition. (*Id.* at 1434-35.) It was questioned whether he was engaged in drug-seeking behavior. (*Id.* at 1434.)

He arrived there again, also by ambulance, on May 30 after slipping and injuring his back. (*Id.* at 1398-1428.) He did not allow his vital signs to be taken and had to be escorted by security to the bathroom. (*Id.* at 1398.) He was abusive to the staff, refused to move from the stretcher, threw things, and was placed in restraints. (*Id.* at 1400-01.) A drug screen was positive for oxycodone. (*Id.* at 1416.) The next day, Plaintiff wished to check himself out because he was not being given medication for his back pain; he was not allowed to leave because his alcohol level was still too high. (*Id.* at 1404.) After his level was sufficiently low for Plaintiff to be considered stable, he was discharged home with diagnoses of alcohol intoxication and low back pain. (*Id.* at 1416.)

Three days later, on June 3, Plaintiff was seen at the St. Mary's Health Center ("St. Mary's") emergency room for back pain that had started the previous Thursday – May 30 – but had not been treated at BJH. (*Id.* at 640-644.) He was given an injection of hydromorphone and of Zofran and diagnosed with back pain. (*Id.* at 644.) Lumbar spine x-rays were ordered. (*Id.*)

Plaintiff returned to St. Mary's emergency room on August 23 after running out of medication. (*Id.* at 633-39.) His current medications included MS Contin (morphine), baclofen, tramadol, Flexeril, oxycodone, ibuprofen, prednisone, Elavil, and Neurontin (gabapentin). (*Id.* at 636-37.) MRIs of his cervical and lumbar spine showed degenerative joint disease. (*Id.* at 637.) Plaintiff was diagnosed with chronic back pain; given an injection of morphine; prescribed tramadol, Flexeril, and naproxen; and discharged. (*Id.* at 638.)

On September 13, Plaintiff was taken by ambulance to the BJH emergency room for complaints of abdominal pain. (*Id.* at 1363-97.) An EKG revealed kidney stones. (*Id.* at 1381.)

Plaintiff was discharged home with prescriptions for tramadol and hydrocodone and with dietary restrictions. (*Id.* at 1389, 1392, 1394.) He returned on September 30 for a refill of his medications. (*Id.* at 1343-62.) He was given a prescription for oxycodone and discharged with a diagnosis of chronic pain syndrome. (*Id.* at 1355.)

On October 30, Plaintiff was treated at St. Louis University Hospital ("SLU") for neck and back pain after falling on a broken step at home at 4 a.m.. (*Id.* at 719-23.) After the fall, he had been able to build a fire in his fire pit and walk with a cane as usual. (*Id.* at 721.) His pain was not being controlled with his current medication. (*Id.*) He was diagnosed with neck pain, prescribed hydrocodone-acetaminophen, and discharged. (*Id.* at 722.) He was instructed not to combine muscle relaxants "and try to get this step assessed again for repairs given his apparent 'disabilities.'" (*Id.* at 723.)

Plaintiff returned to the BJH emergency room on November 26 for complaints of back and neck pain. (*Id.* at 1321-42.) It was noted he walked from his wheelchair to the stretcher without difficulty and he had a steady gait. (*Id.* at 1322.) He reported "'blanking out'" for a few minutes earlier and having done so multiple times since that August. (*Id.*) He was alert and oriented to time, place, person, and situation. (*Id.*) On examination, he had a normal range of motion. (*Id.* at 1324.) A computed tomography ("CT") scan of his head was normal, as were x-rays of his lungs. (*Id.* at 1328-32.) He was diagnosed with neck and back pain, muscle spasms, and degenerative disc disease; given a prescription for hydromorphone, and discharged. (*Id.* at 1335-40.)

On December 8, Plaintiff was treated at the BJH emergency room for back pain after falling onto concrete and for nausea. (*Id.* at 1279-1320.) He had taken seven Vicodin pills. (*Id.* at 1286.) He was given hydromorphone for the pain, cough medicine, and Albuterol for

9

wheezing. (*Id.* at 1293.) CT scans of his head, pelvis, and cervical spine showed no acute abnormalities or fractures. (*Id.* at 1297-1310.) He was diagnosed with an upper respiratory infection and a fall and discharged. (*Id.* at 1311-18.)

Explaining he had passed out from right shoulder pain after falling in his bathroom, Plaintiff returned to the SLU emergency room on December 22. (*Id.* at 710-18.) A CT scan of his abdomen and pelvis showed kidney stones and a fat-containing left inguinal hernia; x-rays of his chest showed no acute pulmonary disease; and x-rays of his right shoulder showed no acute osseous injury. (*Id.* at 715, 717-18.) He was discharged with diagnoses of chronic back pain, bronchitis, and shoulder pain. (*Id.* at 713.)

Plaintiff walked into the BJH emergency room on January 13, 2014, with complaints of increasing right shoulder pain. (*Id.* at 1264-78.) He was no longer on pain medication. (*Id.* at 1264.) He was given an injection of morphine. (*Id.* at 1266.) He was diagnosed with chronic pain syndrome; prescribed hydrocodone-acetaminophen, naproxen, and ibuprofen; and discharged. (*Id.* at 1270-71.)

Nine days later, Plaintiff returned. (*Id.* at 1210-63.) He had been operating his motorized wheelchair after his eyes were dilated at BJH, had fallen down five steps, and had injured his right shoulder. (*Id.* at 1211.) At one point, Plaintiff was "manipulative, angry, threatening" and stated he would call EMS and have them take him by ambulance to another hospital if he did not receive the pain medications he needed. (*Id.* at 1217.) X-rays were taken of his chest, pelvis, and thoracic and lumbar spine; CT scans were taken of his head and cervical spine. (*Id.* at 1222-49.) The x-rays revealed Grade 1 anterolisthesis of L4 and L5. (*Id.*) A neurologist examined him and concluded he was okay to be discharged home with prescriptions. (*Id.* at 1217.) Plaintiff was given an injection of morphine and a prescription for a 24-hour supply of

10

hydrocodone-acetaminophen and oxycodone-acetaminophen. (*Id.* at 1213.) He was discharged with diagnoses of chronic pain syndrome, fibromyalgia, and a fall. (*Id.* at 1250.)

The next day, Plaintiff had a CT scan at SLU of his lumbar spine. (*Id.* at 687.) In addition to the anterolisthesis, it showed bilateral kidney stones and distention of the urinary bladder. (*Id.*)

Plaintiff was seen at SLU on January 23 and admitted three days later. (*Id.* at 675-709.) He lived alone, and was able to bathe and dress himself, cook meals, clean, and do some laundry. (*Id.* at 701.) He could no longer work in construction and now worked part-time in marketing with his brother. (*Id.*) He was applying for disability. (*Id.*) He explained his chronic back pain was worse after he fell down some stairs the day before at BJH. (*Id.* at 689.) He was weak in his lower extremities. (*Id.*) He had purchased a motorized chair with private money, but was currently ambulatory. (*Id.* at 694.) His pain was alleviated only with medication or alcohol. (*Id.*) He wanted placement in a long-term care facility. (*Id.* at 689.) An MRI of his brain showed mild diffuse cerebral volume loss and was otherwise unremarkable. (*Id.* at 686.) A neurologist recommended a neuropsychological evaluation and a psychiatry evaluation. (*Id.* at 689, 694-98.) Plaintiff's insurance denied the former; he declined the latter. (*Id.*) Plaintiff was discharged two days later with a pain regimen of oxycodone as needed, was to follow-up with his primary care physician in one to two weeks, and was encouraged to apply for benefits through the VA. (*Id.* at 689-90.)

Plaintiff was seen at St. Luke's Hospital on February 18 for rectal bleeding caused by taking too much ibuprofen. (*Id.* at 964-70.) On examination, he had a normal range of motion and normal strength. (*Id.* at 966-67.) He was diagnosed with a possible polyp and possible internal hemorrhoids. (*Id.* at 968.)

11

Plaintiff was admitted to St. Alexus Hospital on May 22 for his complaints of neck, back, and lower extremity pain. (*Id.* at 1591-97.) He was given steroid injections. (*Id.* at 1592.) His "pain was managed adequately with different medications." (*Id.*) His diagnoses on discharge on June 11 were back pain, degenerative joint disease, hyperlipidemia, vitamin D deficiency, essential hypertension, chronic obstructive pulmonary disease ("COPD"), asthma, abnormal gait, obesity, and neuritis and tobacco dependency. (*Id.* at 1592-93.) He was accepted at a nursing home and discharged in a stable and improved condition. (*Id.* at 1592.)

On June 25, Plaintiff was involuntarily admitted to the psychiatric floor at St. Alexus Hospital. (*Id.* at 1596-1611.) During his twenty-one day involuntary stay, Plaintiff was compliant and cooperative with his medications. (*Id.* at 1598.) After a physical consultation on July 13, he was diagnosed with bilateral tinea pedis and bilateral edema. (*Id.* at 1603-04.) He was prescribed a cream for the former and compression stockings for the latter. (*Id.* at 1604.) He was discharged in stable condition on July 23 to a nursing home, and instructed to follow-up with a psychiatrist. (*Id.* at 1598-99.) His diagnoses were bipolar affective disorder, hypomanic; impulse control disorder, not otherwise specified; generalized anxiety disorder; opiate dependency; and personality disorder, not otherwise specified. (*Id.* at 1598.)

The next day, Plaintiff was seen at the BJH emergency room for shortness of breath, palpitations, and bilateral leg swelling. (*Id.* at 1181-1209.) He reported that the problems had been occurring for two weeks, but had been ignored at another hospital. (*Id.* at 1187.) Chest x-rays revealed interval development of linear atelectasis in both lungs but were otherwise normal. (*Id.* at 1195.) He was treated with medication for the swelling; diagnosed with leg swelling, foot pain, hypertension, and low back pain; and discharged. (*Id.* at 1199-1201.)

12

Plaintiff returned to the emergency room three days later with complaints of painful swollen legs, arms, and tongue. (*Id.* at 1156-80.) He had been taking additional doses of oxycodone for the pain and was concerned he would run out of the medication. (*Id.* at 1163.) An ultrasound of his abdomen revealed no fluids; an EKG was abnormal. (*Id.* at 1165.) Chest x-rays showed small lung volumes but were otherwise normal. (*Id.* at 1170.) Plaintiff was admitted to the hospital for further evaluation. (*Id.* at 1000-05, 1171.) After additional tests, it was opined that his edema was due to his immobility. (*Id.* at 1001.) He was discharged on July 31 in good condition; with diagnoses of lower extremity edema, venous stasis, chronic low back pain, and history of polysubstance abuse; and with prescriptions for lisinopril for high blood pressure and oxycodone for pain. (*Id.* at 1000-01, 1004.) The same day, he was admitted to a nursing home for intermediate care. (*Id.* at 730-35.) His diagnoses included edema, unspecified venous insufficiency, lumbago, benign essential hypertension, headache, and hypercholesterolemia. (*Id.* at 730.)

On March 14, 2015, Plaintiff returned to the BJH emergency room, complaining of chest pain and a chest infection the nursing home refused to treat, of missed heart medication the home refused to give him, and anxiety. (*Id.* at 1126-55.) Also, he had been given OxyContin instead oxycodone and it was "'making him feel funny.'" (*Id.* at 1127.) The social worker and physician contacted the nursing home and were told that Plaintiff would leave the building after receiving pre-packaged medications. (*Id.* at 1130-31.) Pursuant to an additional contact with the nursing home about the heart medications, the physician was informed that Plaintiff only stayed there at night and often left during the afternoons to go to hospitals. (*Id.* at 1135.) He had missed the night-time medications for the past three days because he left after taking oxycodone. (*Id.*) Chest x-rays showed mild left basilar atelectasis but were otherwise normal. (*Id.* at 1139.)

He was diagnosed with a cough, muscular chest pain, chronic back pain, other chronic pain, hypertension, and degenerative joint disease and discharged home. (*Id.* at 1140.) An EKG showed him to be at high risk for acute coronary syndrome ("ACS"). (*Id.*)

Plaintiff was seen again at the BJH emergency room on April 9 for complaints of a cough for the past two months. (*Id.* at 815-20, 1103-25.) Chest x-rays showed his lungs to be clear. (*Id.* at 1112.) A CT scan revealed three indeterminate pulmonary nodules, global fatty infiltration of the liver, and a nonobstructing left kidney stone. (*Id.* at 1114.) He was diagnosed with reactive airway disease and discharged with prescriptions for prednisone and an Albuterol inhaler. (*Id.* at 1117-18.)

Plaintiff was taken by ambulance to the BJH emergency room on May 14 for neck and back pain exacerbated by playing with a child and by his unilateral decision to taper-off his pain medication. (*Id.* at 1078-1102.) He also cut back on his marijuana smoking. (*Id.* at 1084.) His medications included OxyContin and oxycodone. (*Id.* at 1082.) He continued to smoke half a pack of cigarettes a day. (*Id.* at 1083.) Plaintiff was given oxycodone, ketorolac, cyclobenzaprine (a generic form of Flexeril), and ibuprofen for pain. (*Id.* at 1084.) He was diagnosed with low back pain and discharged. (*Id.* at 1086.)

Plaintiff returned to the emergency room on May 27 for a refill of medications his doctor had not ordered. (*Id.* at 1062-77.) He was described as having a history of drug-seeking behavior and of narcotics abuse. (*Id.* at 1062.) On examination, he was in no apparent distress and was alert and oriented to time, place, and person. (*Id.* at 1066.) His breath and heart sounds were normal. (*Id.*) Plaintiff was offered Ultram (a brand form of tramadol), Toradol ( a brand form of ketorolac), and gabapentin, but explained that the only medications that helped were OxyContin and oxycodone. (*Id.* at 1065, 1067.) He was informed that a prescription for either

14

would not be filled through the emergency room. (*Id.* at 1067.) He was diagnosed with chronic pain and discharged home. (*Id.* at 1067, 1073.)

When waiting to be seen at a BJH clinic on June 2, Plaintiff accidentally ran his wheelchair into a watercooler and twisted his back. (*Id.* at 972.) He was examined and discharged in fine condition. (*Id.*)

Chest x-rays taken on September 8 revealed the mild left basilar atelectasis earlier detected. (*Id.* at 1018-19.) There were no signs of pneumonia or pulmonary edema; his heart size was normal; his lungs were clear. (*Id.*)

Ten days later, Plaintiff was seen at St. Alexus Hospital and given epidural steroid injections. (*Id.* at 1187-90.) His diagnoses were "[l]ow back"; "[r]ight lower extremity radiculopathy"; and "[r]ight lower extremity pain and numbness." (*Id.* at 1588.)

Also before the ALJ were records from St. Louis Centers for Pain Management for twenty-one visits ranging in date from January 23, 2013[5] to August 21, 2013. (*Id.* at 609-23, 846-908, 914-27, 948-52.) On February 27, Plaintiff reported having a lot of pain the past few days; he had been painting a bathroom. (*Id.* at 614.) At the March 11 visit, Plaintiff reported that work was better; he was taking more breaks. (*Id.* at 616.) His doctor, John G. Hexem, M.D., noted that Plaintiff was out of oxycodone, which had just been refilled three days earlier. (*Id.*) Plaintiff's prescription for oxycodone was to be refilled on March 22. (*Id.*) Dr. Hexem further noted that Plaintiff had not pursued an earlier referral to physical therapy. (*Id.*) The

---

[5]The earliest notes of Dr. Hexem are dated "1-23-12." (*Id.* at 609.) The year is clearly a mistake. Plaintiff was referred to a pain clinic in January 2013. The earliest authorization from St. Louis Centers for Pain Management for a urine screen is dated "1-23-13"; there is an authorization for each visit. (*Id.* at 885-99.) After his notes dated "1-23-12," Dr. Hexem's next notes are dated "1-30-13." Dr. Hexem's earliest prescription is dated "1-30-13"; a prescription for each subsequent visit was written. (*Id.* at 914-27.) And, Plaintiff signed a form consenting to be treated at the Centers on January 23, 2013. (*Id.* at 947.)

15

same day, Dr. Hexem wrote a note that Plaintiff had "multiple low back issues." (*Id.* at 615.) "We request weightlifting be restricted 10 (ten) pounds. Standing 30 mins with a period of rest in between standing." (*Id.*) Plaintiff reported on May 15 that he could work a thirty-hour week when on medication. (*Id.* at 864.) Earlier that month, he had worked "doing floors." (*Id.* at 861.) Two weeks later, Dr. Hexem noted that Plaintiff was still taking more oxycodone than prescribed and counselled him on drinking alcohol. (*Id.* at 866.) He increased Plaintiff's dosage of OxyContin and completed some disability paperwork on Plaintiff's behalf. (*Id.*) In June, Plaintiff reported having fallen after missing a step; he had been drinking and was confrontational. (*Id.* at 872.) Dr. Hexem consistently prescribed Oxycontin, oxycodone, gabapentin, ibuprofen, and Flexeril. (*Id.* at 914-27.)

On May 29, 2013, Dr. Hexem completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical); on November 12, 2013, he completed a Medical Source Statement - Physical on Plaintiff's behalf. (*Id.* at 625-31, 928-34, 953-54.) In the Medical Source Statement of Ability to Do Work-Related Activities ("MSSA"), Dr. Hexem reported that Plaintiff can occasionally lift or carry up to twenty pounds; can sit without interruption for ten minutes and stand or walk without interruption for twenty minutes; can sit, stand, or walk for a total of two hours; does not need to use a cane to ambulate; and can occasionally reach, handle, finger, feel, push, and pull with either hand. (*Id.* at 625-27.) He can occasionally balance, stoop, kneel, crouch, crawl, and climb stairs and ramps, but should never climb ladders and scaffolds. (*Id.* at 628.) He can occasionally be around unprotected heights, moving mechanical parts, extreme cold or heat, and vibrations. (*Id.* at 629.) He can frequently be around humidity, wetness, dust, odors, fumes, and pulmonary irritants, but should never operate a motor vehicle. (*Id.*) He can travel alone, ambulate without a wheelchair or cane, use public transportation,

16

climb a few steps, prepare a simple meal, and care for his personal hygiene. (*Id.* at 630.) He cannot shop, walk a block at a reasonable pace on rough or uneven surfaces, or sort, handle, or use paper and files. (*Id.*)

On the Medical Source Statement – Physical ("MSS"), Dr. Hexem assessed Plaintiff as having the ability to frequently lift or carry less than five pounds, occasionally lift or carry ten pounds, continuously stand or walk for thirty minutes, stand or walk for two hours throughout an eight-hour day, continuously sit for less than fifteen minutes, sit throughout an eight-hour day for two hours, and push or pull to a limited degree. (*Id.* at 954.) Plaintiff can only occasionally climb, balance, stoop, kneel, crouch, crawl, reach, handle, finger, or feel. (*Id.* at 953.) He should avoid moderate exposure to extreme cold or heat, wetness, humidity, dust, fumes, vibrations, and heights. (*Id.*) He should avoid any exposure to hazards. (*Id.*) If suffering pain, he will need to lie down for five minutes every two hours. (*Id.*) His pain, use of medication, or any side effects do not cause a decrease in his concentration, persistence, or pace or any other limitations. (*Id.*)

## The ALJ's Decision

The ALJ first found that Plaintiff met the insured status requirements of the Act through June 30, 2014, and has not engaged in substantial gainful activity since his alleged disability onset date. (Id. at 18.)

He next found that Plaintiff has severe impairments of degenerative disc disease, obesity, asthma, a personality disorder, a major depressive disorder, and an anxiety disorder. (*Id.*) He also has impairments that are not severe, i.e., a history of gout, hyperlipidemia, alleged rheumatoid arthritis, alleged seizure disorder, alleged glaucoma, hypertension, and substance abuse. (*Id.* at 19.)

17

His impairments, singly or combined, do not meet or medically equal an impairment of listing-level severity. (Id.)

Addressing Plaintiff's mental impairments, the ALJ found they result in no restrictions in Plaintiff's activities of daily living; in moderate difficulties in social functioning; and in moderate difficulties in concentration, persistence, or pace. (Id. at 20.) For instance, Plaintiff spent time socializing at a coffee shop and is able to follow written instructions. (Id.) He had experienced one episode of decompensation. (Id.)

The ALJ next assessed Plaintiff's residual functional capacity (RFC). (Id. at 21-29.) He determined that Plaintiff has the RFC to perform light work with additional limitations of occasionally lifting twenty pounds and frequently lifting ten pounds; standing or walking about six hours in an eight-hour day; sitting for six hours in an eight-hour day; avoiding (a) climbing ladders, ropes, and scaffolds, (b) working at unprotected, dangerous heights and machinery, (c) doing jobs exposing him to whole body vibrations, (d) doing jobs requiring he ambulate on unimproved terrain, and (e) concentrated exposure to noxious fumes, odors, dusts, gases, and extreme cold. (Id. at 21.) Plaintiff is limited to simple, routine, and repetitive work that does not require close interaction with the public or teamwork type interaction with co-workers. (Id.)

When assessing Plaintiff's RFC, the ALJ reviewed his testimony, evaluated his credibility, and found him not entirely credible. (Id. at 21-23.) The ALJ noted the various inconsistencies in the record of Plaintiff's description of how much he can walk, of his work history, and of his medication compliance. (Id. at 23-27.) He also noted that Plaintiff frequently did not schedule appointments as advised to, did not follow-up with a physical therapist as advised to, and used the emergency room as his primary care provider. (Id. at 27.) Plaintiff had testified he has Medicaid coverage, thus there is no financial reason for his failures to comply or

18

follow-up. (*Id.*) Additionally, he is able to smoke a half-pack of cigarettes a day and, contrary to his testimony, is able to work various jobs. (*Id.* at 27-28.) His many conflicting stories undermine his credibility. (*Id.* at 28.) He testified about his inability to finish sentences, but such was not noted during the hearing or in the medical records. (*Id.*) Plaintiff has not, as he has been encouraged to by his providers, sought medical attention from the VA. (*Id.*) And, his testimony he spends his day at a Bread Company undermined his testimony about being unable to sit; his inconsistent explanations of how he acquired his motorized scooter further weakened his credibility. (*Id.*)

Dr. Herem's assessment was given little weight as it was given during the early stages of Plaintiff's treatment, varied from a partial light exertional level to a sedentary level, and was inconsistent with references in his own notes to Plaintiff doing manual labor. (*Id.* at 28-29.)

With his RFC, Plaintiff is unable, however, to perform any past relevant work. (*Id.* at 29.) With his age, education, and RFC, he can perform other work that exists in significant numbers in the national economy. (*Id.* at 29-30.) The ALJ then concluded that Plaintiff is not disabled within the meaning of the Act. (*Id.* at 30.)

## Standards of Review

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. §§ 423(d)(1), 1382c(a)(3)(A). Not only the impairment, but the inability to work caused by the impairment must last, or be expected to last, not less than twelve months. *Barnhart v. Walton*, 535 U.S. 212, 217-18 (2002). Additionally, the impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work,

19

but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether . . . a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

"The Commissioner has established a five-step 'sequential evaluation process' for determining whether an individual is disabled." *Phillips v. Colvin*, 721 F.3d 623, 625 (8th Cir. 2013) (quoting *Cuthrell v. Astrue*, 702 F.3d 1114, 1116 (8th Cir. 2013) (citing 20 C.F.R. §§ 404.1520(a) and § 416.920 (a)). "Each step in the disability determination entails a separate analysis and legal standard." *Lacroix v. Barnhart*, 465 F.3d 881, 888 n.3 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. §§ 404.1520(b), 416.920(b); *Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010). Second, the claimant must have a severe impairment. See 20 C.F.R. §§ 404.1520(c), 416.920(c). A "severe impairment" is "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ." *Id.*

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d) and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, he is presumed to be disabled and is entitled to benefits. *Bowen v. City of New York*, 476 U.S. 467, 471 (1986); *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite [his] limitations." *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009).

"'[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" *Id.* (quoting *Lacroix*, 465 F.3d at 887); *accord Partee v. Astrue*, 638 F.3d 860, 865 (8th Cir. 2011). "'Before determining a claimant's RFC, the ALJ first must evaluate the claimant's credibility.'" *Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007) (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2002)). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" *Id.* (quoting *Pearsall*, 274 F.3d at 1218).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e), 416.920(e). The burden at step four remains with the claimant to prove his RFC. *Moore*, 572 F.3d at 523; *accord Dukes v. Barnhart*, 436 F.3d 923, 928 (8th Cir. 2006); *Vandenboom v. Barnhart*, 421 F.3d 745, 750 (8th Cir. 2005).

If, as in the instant case, the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish the claimant maintains the RFC to perform a significant number of jobs within the national economy. *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009); *Banks v. Massanari*, 258 F.3d 820, 824 (8th Cir. 2001). *See also* 20 C.F.R. §§ 404.1520(f), 416.920(f). The Commissioner may meet her burden by eliciting testimony by a VE, *Pearsall*, 274 F.3d at 1219, based on hypothetical questions that "'set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments,'" *Jones v. Astrue*, 619 F.3d 963, 972 (8th Cir. 2010) (quoting *Hiller v. S.S.A.*, 486 F.3d 359, 365 (8th Cir. 2007)).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" *Wiese v. Astrue*, 552 F.3d 728, 730 (8th Cir. 2009) (quoting *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008)); *accord Dunahoo v. Apfel*, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" *Partee*, 638 F.3d at 863 (quoting *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005)).

## Discussion

Plaintiff argues that the ALJ erred by (1) failing to fully and fairly develop the record and (2) finding he can perform light work. [6]

Plaintiff first contends that the ALJ's finding that Dr. Hexem's Medical Source Statement was given in the early stages of treatment is factually incorrect because Plaintiff's treatment started on January 23, 2012 – sixteen months before the MMSA was completed. As noted above, however, see note 5, supra., Plaintiff did not begin treatment with Dr. Hexem until January 23, 2013. The MSSA was completed four months later. *See Fentress v. Berryhill*, 854 F.3d 1016, 1020 (8th Cir. 2017) (ALJ did not err in discounting opinion of physician who had been treating claimant only for a few months).

Plaintiff also cites the March 11, 2013 note of Dr. Hexem indicating weight and standing restrictions. This note was issued the same day Plaintiff reported that work was better. Moreover, the note did not place any restrictions on Plaintiff's exertional activities; it was

---

[6]Plaintiff does not challenge the ALJ's adverse credibility finding.

phrased as a "request" by an undefined "we." And, as noted by the ALJ, the restrictions in the MSSA were inconsistent with the repeated references in Dr. Hexem's notes about Plaintiff doing manual labor.

"The opinion of a treating physician is generally afforded 'controlling weight if that opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.'" *Chesser v. Berryhill*, 858 F.3d 1161, 1164 (8th Cir. 2017) (quoting *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010)). *See Papesh v. Colvin*, 786 F.3d 1126, 1132 (8th Cir. 2015) (holding that a treating physician's opinion "may have 'limited weight if it provides conclusory statements only, or is inconsistent with the record'") (quoting *Samons v. Astrue*, 497 F.3d 813, 818 (8th Cir. 2007)). As noted by the Commissioner, the restrictions in Dr. Hexem's MSSA are inconsistent with his treatment records and with other contemporaneous records. (Commissioner's Brief at 6-7, ECF No. 28, citing various inconsistencies). It is also inconsistent with Plaintiff's testimony. For instance, Dr. Hexem concluded that Plaintiff can only sit for ten minutes, but Plaintiff developed edema from prolonged sitting and testified he spends his days sitting at a restaurant. Dr. Hexem concluded that Plaintiff did not need a cane; however, Plaintiff testified he did. He opined that Plaintiff could travel without a wheelchair; Plaintiff testified in 2015 he had needed one for four years.

Nor is Dr. Hexem's MSSA supported by any corroborating examinations or tests. *See Fentress*, 854 F.3d at 1020 (affirming Commissioner's decision discounting opinion of claimant's treating physician on his abilities that was inconsistent with objective findings in other medical records and with physician's contemporaneous notes). *See also Toland v. Colvin*, 761 F.3d 931, 935-36 (8th Cir. 2014) (ALJ did not err in discounting treating physician's MSS

23

that was not supported by treatment notes or medical records). Additionally, as noted by the ALJ, Plaintiff often inexplicably failed to follow treatment recommendations, including those of Dr. Hexem. *See Wildman*, 596 F.3d at 964 ("[A] claimant's noncompliance can constitute evidence that is inconsistent with a treating physician's medical opinion and, therefore, can be considered in determining whether to give that opinion controlling weight." (interim quotations omitted) (alteration in original)) (finding ALJ had not erred in discounting treating physician's opinion about claimant's capabilities when it failed to account for claimant's noncompliance with treatment regimen).

Plaintiff argues that the ALJ had a duty to call a medical expert to testify at the administrative hearing or to send Plaintiff for a consultative examination if he was dissatisfied with Dr. Hexem's assessment.

"'Well-settled precedent confirms that the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case.'" *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010) (quoting *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004)). "While '[a]n ALJ should recontact a treating or consulting physician if a critical issue is undeveloped,' 'the ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled.'" *Martise v. Astrue*, 641 F.3d 909, 926-27 (8th Cir. 2011) (quoting *Johnson v. Astrue*, 627 F.3d 316, 320 (8th Cir. 2010)) (alteration in original). "[T]he burden of persuasion to prove disability and demonstrate RFC remains on the claimant." *Vossen*, 612 F.3d at 1016. And, "[w]hile an ALJ does have a duty to develop the record, this duty is not never-ending and an ALJ is not required to disprove every possible impairment." *McCoy v. Astrue*, 648 F.3d 605, 612 (8th Cir. 2011).

24

When determining Plaintiff's RFC, the ALJ reviewed the entire record, including the medical records, Plaintiff's testimony, and the forms he completed pursuant to his applications. (Tr. at 23-28.) The record includes examination findings of Plaintiff having 5/5 muscle strength in his upper and lower extremities, [7] a normal range of motion, mild to moderate multilevel degenerative disc disease, and a normal gait, and of being in no apparent distress. (*Id.* at 24-25.) The record also includes references to Plaintiff doing manual labor during times he was allegedly incapable of working. (*Id.* at 27.) In contrast to the ALJ's detailed citations to the record, Plaintiff does not refer to anything in the record aside from Dr. Hexem's assessments that favors a different RFC than that defined by the ALJ.

Plaintiff also argues that the ALJ's finding he can perform light work is in error because it is not supported by an RFC of a non-examining or consulting physician. For the reasons discussed above, the ALJ did not err in his assessment of Plaintiff's RFC. The hypothetical question posed to the VE included the limitations defined in that RFC. *See Cruze v. Chater*, 85 F.3d 1320, 1323 (8th Cir. 1996) ("The ALJ's hypothetical question need only include those impairments that the ALJ finds are substantially supported by the record as a whole.") (interim quotations omitted). "Testimony from a VE based on a properly phased hypothetical question constitutes substantial evidence." *Id.*

For the foregoing reasons, Plaintiff's second argument is without merit. *See Martise*, 641 F.3d at 927 (concluding that, because the ALJ's RFC findings were supported by substantial

---

[7]*See Wright v. Colvin*, 789 F.3d 847, 853 (8th Cir. 2015) (rejecting claimant's argument that the ALJ had erred in discounting physician's report that he could not stand for long due to degenerative condition in lower extremities when studies revealed that he had 5/5 muscle strength in those extremities).

evidence, the hypothetical question to the VE was proper, and the VE's answer constituted substantial evidence supporting the Commissioner's denial of benefits).

## Conclusion

An ALJ's decision is not to be disturbed "'so long as the . . . decision falls within the available zone of choice. An ALJ's decision is not outside the zone of choice simply because [the Court] might have reached a different conclusion had [the Court] been the initial finder of fact.'" *Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011) (quoting *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008)). Although Plaintiff articulates why a different conclusion might have been reached, the ALJ's decision, and, therefore, the Commissioner's, was within the zone of choice and should not be reversed for the reasons set forth above. *See Fentress*, 854 F.3d at 1020 (concluding that "[w]hile it was not surprising that in an administrative record which exceeds 1,500 pages,[8] [claimant] can point to some evidence which detracts from the Commissioner's determination, good reasons and substantial evidence on the record as a whole support the Commissioner's RFC determination and the decision to discount [treating physician's] opinion") (footnote added). [9]

Accordingly,

---

[8]The record in this case is more than 1,600 pages.

[9]The Court thanks appointed counsel for her services and will entertain a motion to withdraw upon receiving the appropriate motion, which should include her assurances that she has informed Plaintiff of his right to seek an appeal and the time limits thereof.

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and

that this case is DISMISSED.

A separate Judgment will accompany this Order.

Dated this ⟋⟋⟋ day of March, 2018.

RONNIE L. WHITE
UNITED STATES DISTRICT JUDGE